IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HARALD MARK GALZINSKI,

           Petitioner,                  No. 2:09-cv-2251 LKK JFM (HC)

     vs.

MIKE McDONALD,

           Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury in 2005 of substantial sexual conduct with a child under the age of fourteen (in violation of Cal. Pen. Code § 288.5(a)[1]); three counts of aggravated sexual assault of a child by oral copulation (§ 269(a)(1)); aggravated sexual assault of a child by sodomy (§ 269(a)(3)); four counts of rape (§ 269(a)(4)); seven counts of forcible lewd and lascivious acts with a child (§ 288(b)(1)); attempted forcible lewd conduct (§§ 664/288(b)(1)); with the special allegations that the crimes were committed against two or more victims (§ 667.61(e)(5)).  Lodged Document ("LD") 1 at 745-46.  In light of petitioner's prior felony convictions, petitioner was sentenced to state prison for 338 years to life. <u>Id.</u>

---

[1] All future statutory references will be to the California Penal Code unless noted otherwise.

This action is proceeding on three claims raised in the petition, filed August 14, 2009. Petitioner claims that his Faretta[2] waiver was obtained without the requisite knowledge and understanding of consequences; that the trial court improperly excluded evidence that one of the victims consented to "rough sex" with him in the past; and that his appellate counsel was ineffective for failing to raise three claims in his direct appeal.

PROCEDURAL BACKGROUND

Following a month-long trial on thirty-one counts that resulted in a mistrial due to a hung jury, the State elected to retry petitioner. See LD 1 at 25. Two court days prior to the commencement of the second trial, petitioner made a Faretta motion, which was denied as untimely. Id. at 21-28. When the trial date was continued by three weeks, petitioner renewed his Faretta motion and the trial court granted it. See LD 5. Petitioner represented himself throughout the remainder of his criminal proceedings, and was subsequently convicted and sentenced to 338 years to life in state prison. See LD 1 at 745-56.

Petitioner appealed to the state appellate court, which denied the appeal on February 14, 2007. LD 3. On March 23, 2007, petitioner appealed to the California Supreme Court. LD 4. This appeal was denied on June 13, 2007. Id.

On August 13, 2008, petitioner filed a petition for habeas relief in the Sacramento County Superior Court raising the same claims raised here, and he attached to the petition a declaration purportedly executed by him.[3] See LD 5. On September 23, 2008, petitioner supplemented his petition with the transcript of the hearing on petitioner's second Faretta motion. LD 6.

/////

---

[2] Faretta v. California, 422 U.S. 806 (1975).

[3] This declaration was not signed by petitioner, but was signed by petitioner's counsel, who declared that he prepared the declaration based on a telephone interview with petitioner. This declaration was dismissed as hearsay by the state court on habeas review. See LD 7 at 3-4.

2

On October 2, 2008, the superior court denied the habeas petition.  LD 7.  As to petitioner's first two claims, the court found them procedurally barred with citation to In re Dixon, 41 Cal.2d 756 (Cal. 1953).  Id.  As to petitioner's ineffective assistance of counsel claims, the court found, inter alia, that petitioner failed to state prima facie claims for relief.  Id.

On November 21, 2008, petitioner appealed to the state appellate court.  LD 8.  That appeal was summarily denied on December 4, 2008.  Id.

On January 23, 2009, petitioner filed an appeal with the California Supreme Court, which also summarily denied the petition on August 12, 2009.  LD 9.

FACTUAL BACKGROUND[4]

A

*The Prosecution*

N. M. met [petitioner] through mutual friends when she was 16 years old and he was 21 years old.  She has one son and [petitioner] has one son and one daughter, A.

N. M. and [petitioner] began dating shortly before her 18th birthday and became engaged on Christmas 1998.  N. M. and her son would spend the night at [petitioner]'s mother's home where [petitioner] and his children also lived.  In May 2002, N. M. and [petitioner] bought a house together.

On December 13, 2003, N. M. was hosting a party for her son's soccer team at a bowling alley in Sacramento.  [Petitioner] and his two children also attended.  While the children played games, [petitioner] drank heavily.  At the end of the evening, N. M. drove [petitioner] and the children home and told the children to help [petitioner] into the house while she was going to park her truck in the back.  The children were having trouble helping [petitioner], so N. M. turned off her truck and came into the house, where she found [petitioner] lying on the couple's bed.  [Petitioner] confirmed that he was okay and told N. M. to park her truck.  As N. M. was getting ready to walk out, [petitioner] called to his daughter, and she came running.  N. M. then walked out of the bedroom and parked her truck.

When N. M. reentered the bedroom, [petitioner] was lying on the bed with his pants around his knees and his penis erect.  A. had her thumbs on the waistband of her pants, as though she was about to pull down her pants.  N. M.

[4] The statement of facts is taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Galzinski, No. C051502 (February 14, 2007), a copy of which was lodged by respondent on November 23, 2009 as Lodgment 3.

3

screamed, "what the [fuck] is your dick doing out and your daughter laying next to you?" [Petitioner] rolled off the bed, and A. "took off running."

N. M. tried to jump over [petitioner], but he grabbed her and started punching her. He told her to "suck his dick" and pushed her face into his "privates." N. M. orally copulated [petitioner] while he kept punching her. He then ordered her to get on top of him, and when she said "no," he punched her again. She got on top of him, and the two had sexual intercourse. Thereafter, he told her to "suck [his] dick again," and she complied. After this second act of oral copulation, [petitioner] told N. M., "if you don't take care of this, A[.] will."

N. M. ran down the hall and gathered up the children. They got in her truck, and N. M. "just drove." In the truck, N. M. asked A. if "this [had] ever happened to you before?" A. said "yes." N. M. then asked if [petitioner] had ever hurt her, and A. replied, "kinda." When N. M. told her "this is a yes-or-no question," A. said, "well, then yes." N. M. ended up taking the children to a motel where they all spent the night.

The next morning, N. M. and the children returned to the house. N. M. decided not to call the police because she was afraid [petitioner] would lie, A. would be "too afraid to tell the truth," and then [petitioner]'s children would be returned to him, as she was not their biological mother.

When they entered the house, [petitioner] said he had "blacked out" and "need[ed] to know what happened." N. M. told [petitioner] only what he had done to her and said she wanted to leave. She did not tell [petitioner] about what she had seen in the bedroom between him and A. because she (N. M.) would be in danger. [Petitioner] was leaving for work and asked N. M. to drop some things off at his mother's house. N. M. agreed and took the children with her. She told [petitioner]'s mother that she did not want to be in the relationship any longer because [petitioner] drank too much and was abusive.

N. M. took the children back home. N. M. "was still in a state of shock." She slept on the couch and the children slept in their bedrooms. The next morning, Monday, she went to work, and the children went to school. N. M. confided in a coworker that [petitioner] was molesting A. She also contacted a friend who worked at child protective services, who told her that all schools are "mandated reporters" and that if a molested child "tells somebody at school," she would be "protected the moment that [she] t[old]." N. M. told A. that A. needed to tell her story to a school nurse on Wednesday when [petitioner] was at work.

On Wednesday morning when A. was at school, she called N. M. at work and said the school nurse was not there. N. M. drove to the school, and A. told the school secretary "a little bit" of what had happened to her. The secretary then called the principal, who in turn called child protective services.

At trial, 10-year-old A. testified that [petitioner] started molesting her when she was four. These incidents would take place when N. M. was at work, or N. M. and the boys were at soccer practice, or when everyone else was sleeping. When she was five years old, [petitioner] put his penis in her vagina and "butt" more than five times. When she was six and seven years old, [petitioner] put his

penis in her vagina, "butt," and mouth more than five times.  When she was eight years old, [petitioner] put his penis in her vagina more than five times, put his penis in her "butt" more than 10 times, and put his penis in her mouth more than 10 times. [Petitioner] repeatedly told her that if she told anyone, he would hurt her.

A. remembered one specific incident when N. M. was on a business trip to Colorado.  After [petitioner] and the children had finished watching a movie in the living room, [petitioner] took A. into his room, took off her pajamas, and put his penis in her vagina, "butt," and mouth.

On December 17, 2003, nurse practitioner Glendora Trestler examined A.  There was thickening of A.'s hymen that could have been due to a healed injury.  There was also an immediate dilatation of A.'s anus when she was lying back, which indicated that something had happened to the anal tissue to "mak[e] it relax quickly as opposed to staying closed."

A. was examined again on February 1, 2004.  A.'s hymen was unchanged since the last examination, so A.'s previous examination would not be considered normal.

Dr. Anthony Urquiza, an associate professor in the pediatrics department at the University of California, Davis Medical Center, testified as an expert on child sexual abuse accommodation syndrome (CSAAS).  The concept of CSAAS was created by an [sic] psychiatrist in 1983 to educate therapists about typical behavior exhibited by child sexual abuse victims and to dispel any misperceptions about how child victims might react.  There are five parts to CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation.  Dr. Urquiza further explained that 90 percent of children are sexually abused by someone with whom they have an ongoing relationship because part of sexual abuse is having control and power over children.

B

*Prior Acts*

During N. M.'s relationship with [petitioner], he was abusive.  He would lose his temper when he was "stressed out," which happened at least four times a month.  His anger would be directed at her, other family members, or the children.  Afterward, [petitioner] would become calm and sometimes apologetic.  On one occasion he threatened to kill her if she did not do what he said.  On other occasion he choked her until she passed out.  He had also threatened to hunt her down if she ever left him.

When they moved to their home, [petitioner] slapped N. M. on the face and called her a "[s]tupid bitch" because she spilled a frozen pitcher of red margarita or daiquiri on the new carpet.  There were also times when he would force her to have sex with him.  She never told any of her family or friends about the abuse because she was ashamed and embarrassed.

N. M. recalled one incident in Vacaville a few days after she and [petitioner] became engaged. [Petitioner] got into a fight with her father and threatened to kill N. M. [Footnote omitted.]

C

*The Defense*

Nurse practitioner Cathy Boyle examined A. in February 2004 and March 2005. She saw no physical evidence of sexual abuse, so she could not confirm or negate A.'s allegations. Nurse practitioner Leslie Schmidt examined N. M. on September 17, 2003, and found no injuries.

C. D. lived next door to [petitioner], had known him since she was 13 years old, and babysat his children. She described [petitioner] as a "great father" and never saw any abuse in the house. She never saw [petitioner] intoxicated, combative, or threatening to anybody. She never saw [petitioner] and N. M. fight. On cross-examination, she was "shock[ed]" to hear that [petitioner] had gone to prison for felony possession of methamphetamine, "surprise[d]" to hear about the Vacaville incident in which [petitioner] was combative with police officers, and "disturb[ed]" to hear the nature of the sexual abuse allegations A. was making against [petitioner].

A. H., [petitioner]'s mother's live-in boyfriend, never heard the children say that [petitioner] was sexually abusing them. A. H. recalled that on December 19, 2003, he went to [petitioner]'s house and saw N. M. and two men loading up some property. When he went back to the house the next day to retrieve [petitioner]'s mother's car, it was not there, and another car had been stripped of all its musical equipment.

[Petitioner] took the stand on his own behalf. He admitted that he and N. M. fought, and once he slapped her. On the night of December 13, he was very drunk, and they had been fighting. His children helped him into the house, and he laid down on the bed. N. M. and A. came into the room, and A. gave him a hug. N. M. left on her own to park her car. [Petitioner] closed his eyes, and A. got into the bed. He did not have his pants down. N. M. came back into the room, and [petitioner] and N. M. started arguing. He told A. to leave, and she complied. He ended up vomiting on his clothes, so he undressed down to his boxer shorts. N. M. told him, "don't think you're gonna get sex from me," and he replied that he did not want her "pussy," told her to "[g]et the fuck out of [his] house," and that he would "rather fuck the transvestite at the bar, the sister bowling next to us or A[.]" He denied ever touching A. in a sexual way.

LD 3 at 2-8.

LEGAL STANDARD

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable  determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

DISCUSSION

1.     Grounds One and Two

Petitioner's first ground for relief is that his Faretta waiver was improperly granted.  Petitioner's second ground for relief is that relevant evidence was improperly excluded.

The state appellate court denied both of these grounds as procedurally barred:

> Petitioner's conviction for sex offenses against his daughter and his girlfriend was affirmed on appeal and became final in June 2007. Petitioner now claims that the trial court erred in granting his <u>Faretta</u> motion and also erred when it excluded evidence at trial that his girlfriend had consented to "rough sex" on prior occasions. These claims should have been raised on appeal. (<u>In re Dixon</u>, <u>supra</u>, 41 Cal.2d at p. 759.) Petitioner has not demonstrated that any exception applies which would allow these claims to be considered on habeas corpus. Thus, these two claims should have been raised on appeal and are barred. (<u>Ibid.</u>) . . .

LD 7 at 1.

As the United States Supreme Court has explained, in all cases in which a state prisoner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). The state rule is only "adequate" if it is "firmly established and regularly followed." <u>Id.</u> (quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991)); <u>Bennett v. Calderon</u>, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied"). The state rule must also be "independent" in that it is not "interwoven with the federal law." <u>Park v. California</u>, 202 F.3d 1146, 1152 (9th Cir. 2000), cert. denied, 531 U.S. 918 (2000) (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983). Even if the state rule is independent and adequate, the claims may be heard if the petitioner can show: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. <u>Coleman</u>, 501 U.S. at 749-50.

Ordinarily, "cause" to excuse a default exists if the petitioner "can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Ineffective assistance of counsel may be cause to excuse a default only if the procedural default was the result of an independent

1   constitutional violation.  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000) ("Not just any

2   deficiency in counsel's performance will do, however; the assistance must have been so

3   ineffective as to violate the Federal Constitution.").  Put another way, "[s]o long as a defendant is

4   represented by counsel whose performance is not constitutionally ineffective under the standard

5   established in Strickland v. Washington, [466 U.S. 668 (1984)] the federal courts discern no

6   inequity in requiring him to bear the risk of attorney error that results in a procedural default."

7   Murray, 477 U.S. at 488.

8          Here, trial counsel failed to raise these two issues on direct appeal.  That failure

9   precludes review of these claims.  Petitioner seeks to bypass the Dixon bar by arguing that while

10  Dixon is "independent," it is not "adequate" in that California courts have not consistently applied

11  the bar to a habeas claim that is based upon facts which are not contained within the record on

12  direct appeal.  See Traverse at 11-12.  Petitioner then cites to two cases and makes the erroneous

13  argument that his burden in establishing inadequacy is "modest," with citation to Dennis v.

14  Brown, 361 F. Supp. 2d 1124, 1130 (N.D. Cal. 2005).  Petitioner misreads Dennis.  There, the

15  court reviewed the burden-shifting test delineated by the Ninth Circuit in Bennett v. Mueller, 322

16  F.3d 573, 585-86 (9th Cir.2003), for determining whether a state procedural bar is adequate.  The

17  Ninth Circuit held that

18         the ultimate burden of proving the adequacy of the California state bar is upon the
           State of California.... Once the state has adequately pled the existence of an
19         independent and adequate state procedural ground as an affirmative defense, the
           burden to place that defense in issue shifts to the petitioner. The petitioner may
20         satisfy this burden by asserting specific factual allegations that demonstrate the
           inadequacy of the state procedure, including citation to authority demonstrating
21         inconsistent application of the rule. Once having done so, however, the ultimate
           burden is the state's. [¶]
22
23  322 F.3d at 585-86.  Under Bennett, the initial burden is the respondent's: the State must first

24  "adequately ple[a]d the existence of an independent and adequate state procedural ground as an

    affirmative defense."  Id. at 586.  As noted by the Bennett court, this "is an exceedingly *modest*
25
    burden."  361 F. Supp. 2d at 1129 (emphasis added).  Once the respondent has met this "modest"
26

1  burden, the burden shifts to the petitioner to show inadequacy.  Id.  Petitioner confuses his burden

2  with that of the State's.

3  Because respondent met its burden by pleading procedural default, petitioner

4  attempts to meet his burden by presenting the circular argument that because his claims were not

5  before the state court on direct appeal (and, therefore, not in the appellate record), Dixon is

6  inapplicable because that case only applies to claims based on facts contained in the appellate

7  record.  See Traverse at 13-15.  Petitioner then cites to In re Sakarias, 35 Cal.4th 140 (Cal. 2005),

8  and In re Seaton, 34 Cal.4th 193 (Cal. 2004), neither of which is determinative here.

9  In Sakarias, the California Supreme Court held that Miranda claims are cognizable

10  on habeas corpus in limited circumstances, such as where the claim is based substantially on facts

11  outside the appellate record, but that such a claim is subject to denial on procedural grounds

12  where it rests on facts in the appellate record, the claim was already raised and rejected, or could

13  have been raised, but was not, on direct appeal.  35 Cal.4th at 169.  Seaton, in turn, is cited for the

14  following sentence contained in a footnote: "What we mean when we invoke the Dixon bar is that

15  the claim is based on the appellate record, and thus was fully cognizable on appeal insofar as it

16  was preserved at trial."  34 Cal. 4th at 201 n.4.

17  Here, petitioner cannot reasonably argue that his claims are based substantially on

18  facts outside the appellate record.  Instead, the claims deemed procedurally barred in the instant

19  petition – that petitioner's Faretta motion was improperly denied and that probative evidence was

20  improperly excluded – were based on facts that petitioner was aware of at trial and, as such, could

21  have been raised but were not on direct appeal.  See Seaton, 34 Cal. 4th at 200-01.  Thus,

22  petitioner's conclusion that his claims are outside of the appellate record is precisely the point

23  here: petitioner failed to raise the claims on direct appeal despite his awareness of them.

24  Petitioner explanation for this failure – namely, that the transcript of the second Faretta hearing

25  and petitioner's declaration were unavailable until collateral review – does not, without more,

26  satisfy petitioner's burden.  Accordingly, the undersigned finds that petitioner failed to meet his

burden of showing "inadequacy" and, based thereon, finds that petitioner's first two claims are procedurally barred.

2.      Ground Three

Perhaps anticipating that his first two claims were forfeited, petitioner argues that his appellate counsel was ineffective for failing to raise the Faretta claim; for failing to argue that evidence was improperly excluded; and for failing to argue that, in light of the allegedly improperly granted Faretta motion, the trial court erred when it refused to appoint counsel to make a motion for a new trial.

A.      Faretta Motion

i.      State Court Opinion

The state court addressed petitioner's ineffective assistance of counsel claim regarding his Faretta motion as follows:

> Petitioner first argues that his appellate counsel was ineffective for failing to raise his claim that his Faretta motion was improperly granted because he was not advised that he was facing a 338-years-to-life sentence, and that he had no way of knowing that he was facing such a sentence. "A defendant may challenge the grant of a motion for self-representation on the basis that the record fails to show that defendant was made aware of the risks of self-representation." (People v. Bloom (1989) 48 Cal.3d 1194, 1224.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [citation omitted.]" (People v. Koontz (2002) 27 Cal.4th 1041, 1070.)
>
> In the instant case, Petitioner has not stated a prima facie claim for ineffective assistance of appellate counsel because he has not alleged facts showing that there is a "reasonable probability that, but for counsel's [failure to raise the Faretta claim], the result of the [appeal] would have been different." First, Petitioner has not shown that the record failed to show that he was made aware of the risks of self-representation. He attached a portion of the transcript from the September 23, 2005, hearing at which his motion was granted. At that hearing, the trial court reconsidered Petitioner's previous Faretta motion which apparently was denied as untimely at a previous hearing. The transcript shows that the trial court stated that it had previously provided a complete Faretta advisement and that Petitioner gave up his right to be represented by an attorney. Petitioner also cites from the transcript at the hearing where the Faretta motion was previously denied as untimely but does not attach the entire transcript. Petitioner cites to portions showing that he was informed that he faced a sentence

of 15-years-to-life on multiple counts. Petitioner references the advisements given but does not describe what they were and as mentioned, he did not attach the transcript. As a result, Petitioner failed to show a prima facie case that the record fails to show that he was made aware of the risks of self-representation. Moreover, to the extent that he relies upon his declaration attached to the petition to establish facts that he was never advised of the maximum potential sentence either by the court or by his attorney in the previous trial or from any other source, those allegations do not set forth a prima facie claim. Indeed, Petitioner's declaration is unsigned and instead is verified by counsel. Counsel indicates in the declaration that the statements contained therein were based on a telephone conversation with Petitioner. Thus, the declaration is hearsay and hearsay cannot support a prima facie claim for relief on habeas corpus. (People v. Madaris (1981) 122 Cal.App.3d 234, 242; People v. McCarthy (1986) 176 Cal.App.3d 593, 597.)

As a result, Petitioner has failed to show a prima facie claim that appellate counsel was deficient for failing to raise the Faretta claim on appeal or that had counsel raised the Faretta claim on appeal that he was prejudiced because there was a reasonable probability that the result on appeal would have been different.

LD 7 at 3-4.

ii.   Facts

Following a mistrial due to juror deadlock on thirty of thirty-one counts on July 7, 2005, see RT at 12, petitioner was scheduled to be retried on Tuesday, September 20, 2005, see id. at 38.[5] On Friday, September 16, 2005, petitioner appeared before Superior Court Judge Ronald Tochterman with his court-appointed counsel, Laurance Smith. See RT at 21. At the hearing, petitioner made a Faretta motion:

The Court: . . . You are requesting to be allowed to represent yourself?

[Petitioner]: Yes, Your Honor.

The Court: If you were allowed to represent yourself, would you be ready to go to trial on September 20?

[Petitioner]: With an appointment of an investigator, yes, to do my subpoenas.

The Court: What is [petitioner]'s maximum exposure, do you know, [Prosecutor]?

---

[5] Through an amended information, the charges against petitioner were subsequently reduced to nineteen. See RT at 418.

[Prosecutor]: Your Honor, this case has multiple victim enhancements due to the child molestations committed against his minor daughter as well as adult sexual assault charges on his cohabitant girlfriend, which makes it a potential – on one count for each victim would be 15 years to life per count.

The Court: Okay.

[Prosecutor]: And there's [sic] multiple counts.

The Court: Did you hear [the prosecutor's] statement, [petitioner]?

[Petitioner]: Yes, I did.

The Court: Do you understand that?

[Petitioner]: I absolutely do, Your Honor.

The Court: [Petitioner], you do have a right to be represented by an attorney at all stages of the proceedings. [¶] You also have the right to represent yourself, although at this stage in the proceedings, it's not an absolute right. Your motion is addressed in my discretion.

I recommend against representing yourself. [¶] I recommend that you allow Mr. Smith to continue to represent you. There are dangers and disadvantages to representing yourself that you may not understand. I am required to list them. I am going to do that now.

You will be deposed as you know by a trained prosecuting attorney. The Court, meaning the Judge, will not assist you in your efforts to represent yourself. You will be held to the same standards insofar as the rules of evidence, law and procedure are concerned as an attorney is. You may waive or give up important legal rights without knowing or understand that you are doing so. You may omit to do things that are necessary to make an adequate record for an appeal, if an appeal should become necessary. You will not be allowed to argue on appeal that you were incompetent to represent yourself in which you did not adequately represent yourself. No conviction would be reversed based on any such argument.

Because you are in custody, you may have difficulty contacting and interviewing witnesses, though I will appoint an investigator to assist you. You may have difficulty in phrasing questions to witnesses, statements to the Court, arguments to the Court and to the jury.

Are you thinking clearly this morning, [petitioner]?

[Petitioner]: I am, Your Honor.

The Court: Have you ever been under the care of a psychiatrist or a psychologist?

[Petitioner]: No, I have not, Your Honor.

1    The Court:  How far did you go in school?

2    [Petitioner]: I have a high school diploma.

3    The Court:  Can you read and write?

4    [Petitioner]: Yes, sir.

5    RT at 21-23.  Following discussion with Mr. Smith and the prosecutor and upon consideration of

6    the fact that the motion was made two court days before trial was scheduled to commence, Judge

7    Tochterman denied petitioner's motion as untimely.  See RT at 38.

8    The trial was subsequently continued to October 11, 2005, whereupon, on

9    September 23, 2005, petitioner appeared again before Judge Tochterman and raised a second

10   Faretta motion.  Traverse, Ex. A.  At that hearing, the following colloquy took place:

11   [Defense counsel]: This [matter] was sent back to this court by Department
     4 after the trial date was continued approximately three weeks.  [¶]  The Court
12   previously denied, as untimely, a Faretta motion.  Judge Bakarich's intent was to
     allow the Court to reconsider that motion in light of the new trial date.  [¶]

13
     The Court:  [Petitioner], do you still want to represent yourself?
14
     [Petitioner]:  Yes, your Honor.  [¶]
15
     The Court:  All right. I grant –
16
     [Prosecutor]:  Did you do a complete Faretta?
17
     The Court:  Yes, I did last – I did. [¶]  Do you give up your right to be
18   represented by an attorney, [petitioner]?

19   [Petitioner]:  Yes, I do, your Honor.

20   The Court:  I grant the motion.  I order that – this is a grant of a Faretta
     motion.
21
     Traverse, Ex. A. at 4-5.
22
     iii.    Discussion
23
     The Sixth Amendment guarantees the effective assistance of counsel.  The United
24
     States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in
25
     Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, a
26

14

1  petitioner must show that, considering all the circumstances, counsel's performance fell below an

2  objective standard of reasonableness. Strickland, 466 U .S. at 688.  To this end, petitioner must

3  identify the acts or omissions that are alleged not to have been the result of reasonable

4  professional judgment. Id. at 690.  The federal court must then determine whether in light of all

5  the circumstances, the identified acts or omissions were outside the wide range of professional

6  competent assistance. Id.  "We strongly presume that counsel's conduct was within the wide

7  range of reasonable assistance, and that he exercised acceptable professional judgment in all

8  significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

9  Strickland, 466 U.S. at 689).

10        Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

11  693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

12  unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A

13  reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.;

14  see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

15  2000).  A reviewing court "need not determine whether counsel's performance was deficient

16  before examining the prejudice suffered by the defendant as a result of the alleged deficiencies ...

17  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ...

18  that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

19  Strickland, 466 U.S. at 697).

20        The right to counsel guaranteed by the Sixth Amendment "has been interpreted to

21  encompass 'an independent constitutional right' of the accused to represent himself at trial, and

22  thus waive the right to counsel." Stenson v. Lambert, 504 F.3d 873, 882 (9th Cir. 2007) (quoting

23  Faretta v. California, 422 U.S. 806 (1975)).

24        Such waiver, however, must be "knowing, voluntary, and intelligent[.]" Iowa v.
         Tovar, 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) (citing Faretta,

25        422 U.S. at 806, 95 S.Ct. 2525); Faretta, 422 U.S. at 835, 95 S.Ct. 2525 ("the
         accused must knowingly and intelligently forgo" the right to counsel) (citing

26  /////

15

1    Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) (internal
2    quotation marks omitted).

Stenson, id. "Although a defendant need not himself have the skill and experience of a lawyer in

order to competently and intelligently choose self-representation, he should be made aware of the

dangers and disadvantages of self-representation, so that the record will establish that 'he knows

what he is doing and his choice is made with eyes open." Faretta, at 835 (citations omitted).

            No specific colloquy is required by the Constitution or the decision in Faretta.

Lopez v. Thompson, 202 F.3d 1110, 1117 (9th Cir. 2000) (en banc).  However, the Ninth Circuit

has

> gleaned a three-factor test from *Faretta*, under which "[i]n order to deem a
> defendant's *Faretta* waiver knowing and intelligent, the district court must insure
> that he understands 1) the nature of the charges against him, 2) the possible
> penalties, and 3) the 'dangers and disadvantages of self-representation.' " [United
> States v.] Erskine, 355 F.3d [1161] at 1167 [(9th Cir. 2004)] (quoting United States
> v. Balough, 820 F.2d 1485, 1487 (9th Cir.1987)). . . . See also(describing the
> government's burden as "a heavy one"). Ordinarily, only the defendant's colloquy
> with the court at the *Faretta* hearing is relevant to the waiver analysis. [United
> States v. Mohawk, 20 F.3d 1480, 1484 (9th Cir.1994).] . . . However, a "limited
> exception" exists whereby "a district court's failure to discuss each of the elements
> in open court will not necessitate automatic reversal when the record as a whole
> reveals a knowing and intelligent waiver." Balough, 820 F.2d at 1488.

U.S. v. Forrester, 512 F.3d 500, 506-07 (9th Cir. 2008).  The focus of the inquiry is on what the

defendant understood at the time he entered the Faretta waiver.  U.S. v. Mohawk, 20 F.3d at 1484

(citing Balough, 820 F.2d at 1489).  A court's failure to secure a valid Faretta waiver, which

includes an accurate advisement as to maximum penalties, constitutes per se prejudicial error, and

the harmless error standard is inapplicable.  Erskine, 355 F.3d at 1167.  Furthermore, the record

must show that the judge insured that the petitioner understood the possible penalties, or that such

understanding is apparent in the record.  Forrester, 512 at 506-07.

            Petitioner argues that his second Faretta motion was improperly granted because he

was never "told by anyone, nor did he understand from any source nor was he capable of knowing

on his own, that the maximum sentence that he was facing was 338 years to life, which was the

functional equivalent of life without possibility of parole."[6]  Traverse at 9.  This argument is

unavailing.  At the first hearing on his Faretta motion on September 16, 2005 and in response to

Judge Tochterman's question regarding petitioner's maximum exposure, the prosecutor stated,

"[T]his case has multiple victim enhancements due to the child molestations committed against

his minor daughter as well as adult sexual assault charges on his cohabitant girlfriend, which

makes it a potential – on one count for each victim would be 15 years to life per count. . . . And

there's [sic] multiple counts."  See RT at 22.  This statement followed on the heels of a month-

long trial during which petitioner was represented by counsel and was charged with thirty-one

counts.  The second hearing on petitioner's Faretta motion was held on September 23, 2005,

wherein Judge Tochterman relied on the advisements of the September 16, 2005 hearing to grant

petitioner's motion.  United States v. Harris, 625 F.3d 575, 580-81 (9th Cir. 2010) (finding that a

properly conducted Faretta hearing need not be renewed at subsequent proceedings unless

intervening events substantially changed the circumstances).  The record also shows that

petitioner has a high school diploma, thus making him capable of multiplying 15 years by thirty-

one counts for a potential maximum sentence of 465 years to life.

        Petitioner's argument that the prosecutor's statements concerning his potential

exposure, including the alleged ambiguity in the phrase "multiple counts" and her alleged

understatement of the potential sentence by "hundreds of years," as well as the judge's failure to

delineate the charged counts and the potential sentence for each count, constitutes grounds for

habeas relief fails.  As an initial matter, that Judge Tochterman did not repeat the thirty-one

pending counts and multiply the numbers provided by the prosecutor for petitioner's benefit does

/////

---

        [6]  The court notes that the first and third Erskine factors are not at issue here.  As to the first factor, the record reveals that petitioner moved for a Faretta waiver following a trial that resulted in a hung jury on thirty-one counts.  Thus, petitioner was aware of the nature of the charges against him.  As to the second factor, petitioner was informed of the advantages and disadvantages of self-representation.  See RT at 21-23.

1   not warrant habeas relief.  See Lopez, 202 F.3d at 1117 (finding that no specific colloquy is

2   required by the Constitution or Faretta); United States v. Crowhurst, 596 F.2d 389 (9th Cir. 1979).

3          "Ordinarily, [courts simply] review the answers given by a defendant in his or her

4   colloquy with the court to evaluate whether the decision to waive counsel was knowing and

5   intelligent."  United States v. Mohawk, 20 F.3d 1480, 1484 (9th Cir. 1994).  Here, following the

6   prosecutor's recitation of the potential exposure, petitioner was asked whether he understood the

7   prosecutor's statement, to which petitioner responded "I absolutely do."  Also during the hearing,

8   petitioner admitted that "Nobody knows this case better than me."  RT at 24.

9          In addition to what was said at the Faretta colloquy, the record as a whole further

10  confirms that petitioner's waiver was knowing and intelligent.  See United States v. Gerritsen, 571

11  F.3d 1001, 1008 (9th Cir. 2009) ("We have explained that a defendant's waiver must be evaluated

12  in light of the record as a whole[.]") (citing United States v. Kimmel, 672 F.2d 720, 721-22 (9th

13  Cir. 1982)); see also Erskine, 355 F.3d at 1170 & n.11 (explaining that the court may look to the

14  circumstances of prior proceedings in the case to determine whether defendant's waiver was

15  knowing and voluntary).  Petitioner had participated in a month-long trial on thirty-one counts that

16  resulted in a mistrial.  Thus, petitioner's experience in the first trial, coupled with what was said at

17  the Faretta colloquy, illustrates that petitioner understood the nature of the charges against him,

18  the possible penalties that could be imposed against him, and the dangers and disadvantages of

19  self-representation.  See Erskine, 355 F.3d at 1167.  Any ambiguity as to the prosecutor's

20  statement is belied by petitioner's familiarity with and knowledge of the case and the charges

21  pending against him.  Petitioner's waiver clearly met the Faretta standard.  Petitioner's additional

22  argument that he was not informed of possible enhancements likewise fails because he did not

23  face a materially different sentence range.  See Forrester, 512 F.3d at 507.  As such, appellate

24  counsel was not ineffective for failing to raise this issue on appeal.

25          Accordingly, the state court's rejection of petitioner's claim of ineffective

26  assistance of counsel as to his Faretta motion was neither contrary to nor an unreasonable

18

application of applicable principles of clearly established federal law.  This claim should be denied.

      B.     Excluded Evidence

           i.     State Court Opinion

      The superior court next considered petitioner's ineffective assistance of counsel claim as to the excluded evidence:

> Petitioner next claims that his appellate counsel was ineffective for failing to raise the claim that the trial court erroneously excluded the evidence that his girlfriend, who he was convicted of raping, consented to "rough sex" on previous occasions.  Petitioner claims that the trial court admitted the evidence in the first trial at which he was represented by counsel in order to present a defense of consent to the rape charge.  He claims that the only difference in the second trial in which the trial court excluded the evidence was that he was representing himself.  Thus he claims that the trial court penalized him for exercising his right to represent himself.
>
> Petitioner has failed to set forth a prima facie claim for relief that his appellate counsel was ineffective for failing to raise this claim on appeal.  Specifically, Petitioner does not allege that he defended the rape charge with a defense of consent in the second trial.  As a result, Petitioner has not set forth any facts showing why the consent to "rough sex" would be relevant in the second trial.  Therefore, Petitioner has not shown that counsel was deficient for failing to raise the claim that the trial court impermissibly excluded the evidence on appeal or that he was prejudiced by counsel's failure to raise the claim on appeal.

LD 7 at 4.

           ii.     Facts

      On October 13, 2005, a hearing was held before Superior Court Judge Greta Curtis Fall on the State's motion to exclude evidence of the victim's sexual conduct pursuant to California Evidence Code §§ 782[7] and 352[8]; petitioner appeared in pro per.  See RT at 73, 76-81.

---

[7] California Evidence Code section 782 provides in relevant part:

> (a) In any of the circumstances described in subdivision (c), if evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness under Section 780, the following procedure shall be followed:
>
> (1) A written motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the

The Court: . . . [Petitioner], do you wish to be heard?

[Petitioner]: Yes, I do, Your Honor. [¶] . . . I know [the prosecutor] – I believe she cited, the judge – well, anyway the Fossetta (ph) case, there's all these safeguards in there that weigh against this, and for me not to be able to argue our normal sex life, she – basically she makes a [sic] accusation of me having her – hold a knife to her had and assault her sexually with dildos. [¶] Her going out and buying these dildos after the fact kind of says, hey, if you're being assaulted with them, why would you go buy them?

/////

relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness.

(2) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated. The affidavit shall be filed under seal and only unsealed by the court to determine if the offer of proof is sufficient to order a hearing pursuant to paragraph (3). After that determination, the affidavit shall be resealed by the court.

(3) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant.

(4) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.

(5) An affidavit resealed by the court pursuant to paragraph (2) shall remain sealed, unless the defendant raises an issue on appeal or collateral review relating to the offer of proof contained in the sealed document. If the defendant raises that issue on appeal, the court shall allow the Attorney General and appellate counsel for the defendant access to the sealed affidavit. If the issue is raised on collateral review, the court shall allow the district attorney and defendant's counsel access to the sealed affidavit. The use of the information contained in the affidavit shall be limited solely to the pending proceeding. . . .

[8]  California Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1        It's part of her natural – her sexual nature, and they are trying to paint her as
Mother Teresa over here, which she is far from it.  They are trying to exclude her –
2    exhibitionist, her strip club, everything that says who she really is and paint her as,
you know, this goddess that saved this child, when that's not who she is.

3
        The Court:  [Petitioner], I was obviously not the trial judge during the last
4    trial.  What is your recollection as to what the complaining witness testified
occurred specifically on December 13th?
5
        [Petitioner]:  On December 13th.
6
        The Court:  Did she allege the use of a knife or a dildo?
7
        [Petitioner]:  No.  Prior testimony.
8
        The Court:  At any time, is it your recollection or offer or offer proof that
9    she alleged on December 13th that you used either a knife or a dildo in the sexual
assault.
10
        [Petitioner]:  No, Your Honor.
11
        The Court:  All right.  And did you file a noticed motion pursuant to
12    Evidence Code Section 782?  I have not been able to locate one.

13        [Petitioner]:  No, I have not.

14        The Court:  Do the People wish to be heard?

15        [Prosecutor]:  It's the People's position that this information is offered
solely to attack the character of the witness, and, as such, 782 is intended to protect
16    witnesses who were victims of sexual assault from having their consensual sex
lives or their character attacked based upon their consensual sex lives.
17
        In other words, exactly what [petitioner] is saying: I want to paint her as
18    something other than a chaste woman.

19        And that is exactly what this statute is intended not to do, and I don't
believe that any other proper basis has been articulated for the admission of this
20    evidence.

21        The Court:  [Petitioner], anything further?

22        [Petitioner]:  I would just ask that you use the 352 weighing process.
That's what it was put there for, as a safeguard, as cited in the Fossetta case.  It has
23    all these safeguards in there weighing against that.

24        The Court:  All right.  The Court's ruling is as follows:

25        The Defendant has failed to file a noticed motion comporting with the
requirements of Evidence Code Section 782.

26

The motion to exclude evidence of sexual activity of the complaining witness is granted, other than the narrow exception, which will be clearly set forth in the Court's ruling.

The Court has considered Evidence Code Section 782, the applicable case law and has conducted a weighing process pursuant to Evidence Code Section 352.

The defense is specifically ordered not to mention or attempt to introduce any evidence of prior sexual conduct of the complaining witness except the limited area which the Court finds could be otherwise relevant to credibility.

Specifically, the Court understands the evidence to be produced is that the complaining witness was in an ongoing sexual relationship with the [petitioner].

It is alleged that on December 13, 2003, the adult complaining witness walked in and observed the [petitioner] attempting to molest his daughter.

After the daughter fled the room, the [petitioner] physically assaulted the complaining witness and forced her to engaged [sic] in various sexual acts with him.

These forcible sexual acts, which the complaining witness avers, are charged in the Information.

Because the [petitioner] and adult victim Nichelle M. were engaged in an ongoing sexual relationship, the Court will permit evidence of whether she and the [petitioner] had some agreement that he could physically assault her during sex or whether they had previously engaged in sexual acts where she permitted him to physically assault her as part of their agreed-upon sexual relationship.

This goes directly to the issue of the [petitioner]'s intent and whether the sexual acts alleged in the Information were or were not against her will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury.

Specifically as to the items set forth in the motion, the defense is not permitted to elicit or present any testimony as to, one, whether the victim has ever worked at any type of adult strip club.

He is not permitted to elicit or present any testimony whether the victim was an exhibitionist.

He is not permitted to present or elicit testimony whether the victim liked to take pictures of herself.

Or whether the victim and [petitioner] ever videotaped an evening of consensual sex shared between them during their relationship.

He is not permitted to present evidence as to whether they possessed or used dildos or vibrators which they consensually used.

Whether she is into voyeurism.

22

1      Whether she is into watching people.

2      Or whether she is into masks and chains and stuff or slave master type of games.

3

4      The defense is not permitted to elicit or introduce evidence of whether she was blindfolded or tied up as part of consensual sexual activity.

5      The [petitioner] may ask her if they had some agreement that he is to pretend to be a rapist and act like he is raping or choking her, because that, if it existed, could go to the issues material in this case.

6

7      The defense is not permitted to attempt to display to the jury any photographs of the victim.

8

9      The defense is not permitted to go into any alleged molest of the victim by her stepfather.

10     And the [petitioner], if he chooses to take the stand and testify, is not permitted to give testimony that the victim talked to him about voyeurism at hotels or whether she loved to dance naked, went to strip contests, went jogging with Daisy Duke shorts and whether they had taken naked pictures or videos where he had tied her up as in bondage situations.

11

12

13     He would be permitted to testify if any previous agreement existed between them that he was permitted to strike her during their sexual activity.

14     [Petitioner], do you understand the Court's ruling in this regard?

15

16     [Petitioner]:  Yes, I do.  It's excluded, all evidence of our prior sexual conduct.

17     The Court:  I have not – well, if any conduct existed between you where you had some preexisting agreement that you were allowed to hit her or strike her during your normal sexual intercourse and that this was an agreed-upon consensual activity, you may elicit that or present evidence of that if it exists, because it does go to the issue of whether the sex acts in this case were forcible or not.

18

19

20     The other alleged sexual acts have no relevance to this case.

21     You did not file a motion pursuant to Evidence Code Section 782.  Even if you had, the Court cannot see how they would in any way be relevant to the issue in this case.

22

23     So I want you to be clear on the Court's ruling and abide by them.

24     [Petitioner]:  I will, Your Honor.

25  RT at 76-81.

26  /////

23

iii.   Discussion

"The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). Thus, the erroneous exclusion of critical, corroborative defense evidence violates the right to present a defense. DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973), and Washington v. Texas, 388 U.S. 14, 18-19 (1967)). It is well-established, however, that "the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " Rock v. Arkansas, 483 U.S. 44, 55 (1987) (quoting Chambers, 410 U.S. at 295). A criminal defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. Thus, a criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988).

For example, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. 319, 326 (2006). The states have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Thus, a rule, such as that set forth in California Evidence Code § 352, may be applied, consistently with the Constitution, to exclude relevant evidence sought to be introduced as part of the defense case. See Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (addressing Section 352's federal counterpart, Rule 403 of the Federal Rules of Evidence). "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " United States v. Scheffer, 523 U.S. 303, 308 (1998) (citations omitted).

In <u>Moses v. Payne</u>, the Ninth Circuit pointed out that the Supreme Court had articulated these principles "in cases where defendants have argued that state evidentiary rules, by their own terms, impinged upon their constitutional right to present a complete defense."  555 F.3d 742, 756-59 (9th Cir. 2009) (reviewing cases).  The Ninth Circuit observed that these cases did not focus on whether a court's exercise of discretion in excluding evidence violated that right. <u>See</u> <u>id.</u> at 758 (emphasis added).  <u>Moses</u> specifically addressed the application of section 2254(d)(1) to a petitioner's claim that his right to present a defense was violated by the exclusion of expert testimony pursuant to a Washington evidentiary rule that vested the trial court with discretion regarding the introduction of such evidence.  555 F.3d at 756-60.  The Ninth Circuit observed that clearly established federal law does "not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence" or "clearly establish 'a controlling legal standard' for evaluating discretionary decisions to exclude the kind of evidence at issue here."  <u>Id.</u> at 758-59 (citation omitted).

The Ninth Circuit concluded that, "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here, AEDPA does not permit us to rely on our balancing test to conclude that a state trial court's exclusion of [expert] evidence under [the state rule] violated clearly established Supreme Court precedent."[9]  <u>Id.</u> at 760.  Accordingly, the Ninth Circuit held that the state court decision affirming the exclusion of an expert witness's testimony about the victim's depression, on the grounds that the testimony would be cumulative and not sufficiently probative to outweigh its

---

[9]  The <u>Moses</u> panel concluded that the "balancing test" applied in earlier Ninth Circuit decisions to assess the constitutionality of a trial court's discretionary decision to exclude evidence- <u>see</u>, <u>e.g.</u>, <u>Miller v. Stagner</u>, 757 F.2d 988, 994-95 (9th Cir.) (identifying the factors of the balancing test), amended on other grounds, 768 F.2d 1090 (9th Cir. 1985)-"is a creation of circuit law," rather than clearly established Supreme Court precedent, for purposes of Section 2254(d)(1).  <u>Moses</u>, 555 F.3d at 759-60.  Thus, the test did not apply to federal habeas review of a challenge to a state court's exercise of discretion to exclude expert testimony pursuant to a state evidentiary rule affording such discretion.  <u>Id.</u>

1   likely prejudicial and confusing effects, could not be found to violate the right to present a defense

2   under the clearly established federal law and could not warrant relief under Section 2254(d)(1).

3   Id.

4          Similarly here, petitioner claims that his constitutional right to present a complete

5   defense was violated by the trial court's discretionary decision to exclude evidence of the victim's

6   sexual behavior prior to the assault, except insofar as there existed a preexisting agreement that

7   petitioner was allowed to hit or strike the victim during their normal sexual relationship, which

8   was made by the trial court pursuant to California Evidence Code §§ 782 and 352.  As in Moses,

9   petitioner has not and cannot contend that Section 352 and/or Section 782, by their terms alone,

10  infringed upon his federal constitutional right to present a defense.  Rather, like in Moses,

11  petitioner's claim necessarily constitutes a challenge to the manner in which the trial court

12  exercised its discretion in excluding the requested testimony.  555 F.3d at 758.  As Moses

13  establishes, such a claim must fail on Section 2254(d)(1) review because the Supreme Court has

14  not squarely addressed the issue of whether or when a state evidentiary rule requiring the

15  balancing of factors and the exercise of discretion may violate the federal right to present a

16  defense.  Thus, the claim rests on an unsettled legal proposition for purposes of Section

17  2254(d)(1) habeas review.  Id. at 760; see also Wright v. Van Patten, 552 U.S. 120, 126 (2008)

18  (per curiam) (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's

19  decisions "given no clear answer to the question presented, let along one in [the petitioner's]

20  favor," because the state court cannot be said to have unreasonably applied clearly established

21  Federal law).

22         Even assuming petitioner's claims could be analyzed under Ninth Circuit

23  precedent, the claim would still fail.  Prior to Moses, to analyze if the exclusion of evidence

24  violated the defendant's right to present a defense, whether the exclusion was pursuant to a correct

25  or erroneous application of the evidentiary rules, the court would consider the following factors:

26  (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether

1   it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or

2   merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  United

3   States v. Stever, 603 F.3d 747, 755-56 (9th Cir. 2010) (quoting Miller v. Stagner, 757 F.2d 988,

4   994 (9th Cir. 1985)).

5            Petitioner argues that he was punished for appearing in pro per when the trial court

6   denied the opportunity to present probative evidence concerning the adult victim at his second

7   trial, even though identical evidence was deemed admissible in the first trial.  The record proves

8   otherwise.  Judge Fall granted petitioner the opportunity to introduce evidence as it related to

9   whether the victim and petitioner had an agreement in which petitioner was permitted to hit and/or

10  strike the victim during sexual activity.  Introduction of any other evidence regarding the victim's

11  sexual history was prohibited on the basis that petitioner did not file a motion pursuant to

12  California Evidence Code § 782 and because, pursuant to California Evidence Code § 352, Judge

13  Fall found that the information was irrelevant to the charges against petitioner.  As a result, even

14  if the court reviewed this claim de novo, petitioner has not shown that the exclusion of the

15  victim's sexual history was because he was representing himself, but instead because he failed to

16  comply with state procedural requirements and because the state court exercised its discretion in

17  finding that the evidence was irrelevant to the pending charges.  The state court did not deprive

18  petitioner of his right to present a defense and did not violate due process by rendering his trial

19  fundamentally unfair.  As such, appellate counsel was not ineffective for failing to raise this issue

20  on appeal.

21           Accordingly, the state court's rejection of petitioner's claim of ineffective

22  assistance of counsel as to the exclusion of evidence was neither contrary to nor an unreasonable

23  application of applicable principles of clearly established federal law.  This claim should be

24  denied.

25  /////

26  /////

C.      Motion for New Trial

Petitioner sets forth a third and final claim for relief, reproduced here in its entirety:

> Further, appellate counsel performed deficiently by failing to argue that the trial court's error in refusing to appoint counsel to make a motion for new trial on Petitioner's behalf was prejudicial because such a motion could have been based on the trial court's accepting Petitioner['s] Faretta motion without Petitioner being advised of the potential maximum penalties.

Pet., Attach. A at 13.  Respondent does not respond to this argument in his answer and petitioner fails to expound upon it in the traverse.

i.      State Court Opinion

Upon review, the superior court denied this claim:

> Finally, Petitioner claims that appellate counsel was ineffective for failing to claim that the trial court erred in refusing to appoint counsel to make a motion for new trial which he claims could have been based on the Faretta error.  This claim fails first because as seen from the opinion affirming his conviction, appellate counsel did in fact raise a claim that the trial court erred in refusing to appoint counsel.  The claim also fails because to the extent it is based on Faretta error, Petitioner failed to set forth a prima facie claim with respect to his Faretta claim, as described above.

LD 7 at 4-5.

ii.     Facts

Following his conviction on all nineteen counts, petitioner moved to have a lawyer appointed for a motion for a new trial.  See RT at 1258-59.  The court declined the motion as follows:

> I am going to decline to appoint counsel on a motion for a new trial.  I did appoint counsel simply to explain the intricacy of the sentencing. [Petitioner] chose to represent himself in this matter.  If he were represented by an attorney and was representing – or requested a different attorney at sentencing, the Court would determine whether there was an issue of incompetency of counsel that the Court observed before it or whether there were outside factors that the trial would not be – or the trial judge would not be able to see that would necessitate the appointment of a different attorney.
>
> In this case the [petitioner], by choosing to represent himself, cannot claim incompetency of counsel, and there is nothing before the Court to indicate that

/////

there are factors outside of the courtroom that would necessitate the appointment of a different attorney.

In light of the fact that [petitioner] has chosen to represent himself at trial, there is no basis for the Court to appoint him a different attorney for a new trial motion.

Id. at 1259.

      iii.   Discussion

To the extent petitioner argues that appellate counsel did not raise the claim that the trial court erred in denying his motion for appointment of an attorney, the record reflects that counsel did raise this claim in petitioner's direct appeal.  See LD 3 at 25-30.  Insofar as petitioner argues that appellate counsel should have based the error on the allegedly improperly granted Faretta motion, that argument fails for the reasons set forth supra.  Accordingly, this claim should be denied.

For all of the foregoing reasons, petitioner's application for a writ of habeas corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  The undersigned finds that petitioner has made a substantial showing and thus recommends that a certificate of appealability should issue as to all claims.

Accordingly, IT IS HEREBY RECOMMENDED that

1.  Petitioner's application for a writ of habeas corpus be denied; and

2.  The district court issue a certificate of appealability on all issues.

/////

1            These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9    DATED: March 24, 2011.

11   UNITED STATES MAGISTRATE JUDGE

13   /014;galz2251.157